We're going to go on to case number two, which is Sevugan v. Direct Energy Services. That is case number 1830. May it please the Court. Good morning. My name is Grant Lee, on behalf of the plaintiff, Chetty Sevugan. Your Honor, before 1997, consumers in this part of Illinois only had one choice for their supplier of electricity, and that was the local utility ComEd. The Illinois General Assembly decided to partially deregulate the industry to allow alternative retail electric suppliers, or ARIES, such as Direct Energy, to compete with ComEd, all with express stated purpose to lower costs of electricity for consumers like Mr. Sevugan. Against this backdrop, Mr. Sevugan, a ComEd customer, was solicited by Direct Energy to switch his supplier of electricity. Mr. Sevugan's contract with Direct Energy specifically represented in Section 3 that the electric generation service prices of Direct Energy are set competitively. Mr. Sevugan pled that Direct Energy breached this contract by not charging a competitive price. Now, the contract appears to have allowed cancellation at any time without penalty, and it also provided pricing information before the start of each month. What are his damages if they told him every month what they were about to charge and they allowed him to cancel? How could he have been damaged? By his own admission, he accepted the prices every month that he opted to stay on the plan. Sure, Your Honor. Two responses. I'd say the first issue, just because he had a right to cancel without penalty, doesn't absolve the defendant of liability for a breach of the contract. Say that again. I'm sorry, say that again. The fact that he could cancel the contract doesn't absolve the defendant of liability for breach of that contract. Cancellation of the contract is one of the remedies for the defendant's breach. And while it's true that Mr. Sevugan could have called Direct Energy and asked what the price was going to be for the next month, it wasn't automatically disclosed to him. Because of the lack of price transparency in the market, Mr. Sevugan could not know what the wholesale price of electricity was for a given month, could not know what the prices of other competitors were, so therefore there was no way for him to know that he was actually being damaged and that Direct Energy was not living up to its contractual obligations. You know, the problem seems to be that the plaintiff doesn't have the figures for the generally prevailing market rates, as you just noted, for the market prices as defined in the contract. And so is offering proxies for the number and then claiming breach based on those proxies. Now, the proxies are Commonwealth Edison's rates and the PJM wholesale market price, but that's not what the contract is based upon. So how can not meeting those proxy standards be a breach? I mean, I am wondering if he pled himself out of court by tying his claim to terms that are not in the contract. Well, first of all, Your Honor, the fact that a normal consumer can't by himself determine what the wholesale price of electricity was for a given month doesn't mean the attorneys, through investigation and the retaining of consulting experts, figure that out. And that's what the PJM wholesale market price is. PJM wholesale market price is the price for wholesale electricity in the ComEd load zone, which is what the contract requires. Again, if you go to Section 5 of the contract, it says that the variable rate will be based on the generally prevailing market prices for electricity in the PJM market, but it's geographically limited because it says at the electric utility load zone for an applicable period. So that gives us the PJM rate. That's the wholesale rate, correct. And we know the ComEd rate. Yes, Your Honor. But don't we have to know other Aries rates to determine whether or not it's competitive? No, Your Honor, I don't believe we do at this stage of the litigation. First of all, we are under Rule 12 motion, so we have to give plaintiffs the benefit of all reasonable inferences. Now, we've pled that there's no way for us to really know the rates that other Aries charge. This is not publicly disclosed information. It's not available on a website. If you call them and ask them for the historic rate from 2013, they're not going to tell you because you're not a customer of theirs. Tell me this. If I go into a restaurant and the menu tells me that lobster is market price and I'm channeling Judge Posner and I ask the server for the price and then I order the lobster, can I sue the restaurant if I found out later that the restaurant down the block charged half as much? Why or why not? To answer that hypothetical, my answer would be no. The reason why is, first of all, you do have a price that is disclosed and then agreed upon. It's a sum certain. Here on the variable rate, we have no sum certain. We have a black box. They provide a general formula, an addition equation, but they don't tell you what the actual numbers are and there's no way for you to figure that out as a consumer. In addition, there are obviously differing factors between restaurants. One restaurant might be much fancier. Paying for a lobster at Red Lobster versus a lobster from Joe's Seafood, you might expect to pay a higher price at a higher caliber restaurant. Here with direct energy, we don't have those kinds of differences. We're talking about electricity. It's a pure commodity. There's no difference in quality between what direct energy provides and what ComEd provides, so there's no justification for any price premium that direct energy builds its consumers. You know, the Second Circuit in Richards versus direct energy explains why a regulated public utility company is not a fair comparator for an unregulated independent company. Why should we depart from that analysis? Where is the error in that case? Well, the error is in the fact that the contract at issue was different, and on all breach of contract actions, the actual language of the contract, the theory that the plaintiffs are pursuing, is what matters. Now what the plaintiff did in that Second Circuit case was argue that direct energy didn't tie its prices to the local utility's price. So that was his theory, and he could not provide anything in the contract that required that conduct. Here, we're not saying that direct energy was required to charge ComEd's rate. That's not what the contract requires, but that fact does not make ComEd's rate irrelevant for purpose of pleading a plausible claim for breach of contract. You've identified the plausibility standard. Judge Kendall, in her decisions, she is zeroing in on the fact that she's got to see What do you believe are the plausible allegations here that would get you past the 12B standard? Sure, Your Honor. There's a couple. So first of all, on the breach of contract for the set competitively language related to the price, there, the ComEd rate is a plausible fact to show that direct energy's rate is not competitive. And the reason for that is because... Even though the contract was not designed to compete with regulated prices of any sort, but without their unregulated independence. Well, to be fair, ComEd is a competitor of direct energy. There's nothing in the record to support Judge Kendall's arguable conclusion that the other areas are the more direct competition. There's no analysis or statistics about switching behaviors between areas. What we do know is that 70% of consumers are being serviced by ComEd and not in areas. So when you have a market where 70% of the people are paying one price, that defines generally the market price on a weighted average. But don't you have... Those are apples and oranges. It's a regulated market and an unregulated market. Exactly. In which ComEd competes. Now, to be fair, ComEd is a regulated entity, but its rates also account for the fact that ComEd is a for-profit company and has a rate of return. Now, of course, he signed the contract because it gave him predictable low pricing for two years. He could have canceled any time without any penalty. And as far as I can tell, direct energy provided customers with access to the prices before each month began, so he could have checked this. He could have opted out at any time. The good deal... It looks as if the good deal became a bad deal because he failed to react as prices went up. Respectfully, Your Honor, I disagree. The bargain wasn't... Yes, Your Honor. The bargain wasn't a low fixed rate in exchange for a higher variable rate. That wasn't the deal. The deal was a low fixed rate to get Mr. Sivugan to switch from ComEd. But he could have switched back any time. Correct, Your Honor. And again, though, because Mr. Sivugan couldn't know what the wholesale price of electricity was, because Mr. Sivugan doesn't know, could not know, how direct energy actually calculated at that price. All you see on a bill is a total kilowatt per hour charge. You don't know how that was broken up between what they believed or claimed was the wholesale price and what is their adder, which accounts for their profit margin. Unless there's other questions, I would like to reserve the remaining time to rebuttal. But can you see the yellow light? I can, Your Honor. My understanding is the yellow light only tells me when one minute is left of my entire 15 minutes. No, that's the red light. Everyone, I'll give you an extra minute because I'm going to explain. The yellow light means that you're saving that for rebuttal. The red light means one minute. Am I going like this? Sit down. It means that my time is definitely up, Your Honor. Never, never. Okay, thank you. And add a minute because I babbled. Okay. Good morning. Good morning, Your Honors. May it please the Court. Counsel. Matt Matthews for Direct Energy Appley. Your Honors, I'd like to start with a question that Judge Robner started with, which is that Mr. Savugan accepted these rates, paid them each month. He had the ability to call ahead and find out what those rates were going to be, and he had the option to cancel any time he wanted. That's exactly right. And counsel said that doesn't matter because there was no way for Mr. Savugan to know what the other rates in the market were and what the PJM rates were. That's just incorrect. The PJM wholesale rates for each utility load zone were posted on their website, publicly available. Likewise, PluginIllinois.org, which is a website that cited Mr. Savugan's complaint, has an option by which a consumer can compare rates. All you do is put in your utility region, hit Compare Rates, and it shows you every option that's available in the market at that time. The contract says that the price is based upon the generally prevailing market prices, etc. So what you're saying is that there are ways for a consumer to know what that number is, or what those numbers are, if based upon multiple prices. But if direct energy was not, in fact, using that number to set the price, how could a consumer ever know that direct energy was in breach? How could a consumer know if direct energy was in breach if it doesn't have access to those rates? I'm saying they do have access to those rates. Absolute access. There is not a website that posts the historic variable rates for every ARIES back until 2012. That has been required since 2017. There is a website now where every ARIES has to post... I'm referring to ARIES that's the Alternative Retail Energy Supplier. That's the nomenclature in Illinois. They have to post 12 months of historic variable rates online. But there are also a number of other sites that provide information that would be available to consumers or to counsel who are interested in bringing claims like this. The Energy Information Administration posts rates about the average prices that consumers pay in each utility load zone at eia.gov. The Bureau of Labor Statistics posts similar information about average rates that consumers pay. There's a consumer advocacy board in Illinois called the Illinois Citizens Utility Board that also posts ARIES rates. And then, as I mentioned, the Plugin Illinois site which has links to different consumers' websites which they can go to those websites and see if historic rates are posted. Current rates will definitely be posted. The fact that Mr. Savugan or other consumers like him would have to do a little bit of work to come up with the facts to show a plausible breach, that doesn't relieve them of the pleading standard. Aside from all that publicly available information, they could have created a website inviting consumers to submit information about the rates they were charged. They could have submitted a records request to the ICC. The basic fact is that there are no plausible factual allegations that show any breach here or anything more suggestive of improper conduct than proper conduct. Speaking of pleading, on page 11 of the district court's second opinion, the appendix at 29 is where I saw it, the court says that plaintiff pled that the prices were higher at the ComEd and other utilities and ARIES rates. Why is that allegation not enough to proceed? It asserts on information and belief that direct energy prices are not competitive with other independent suppliers, not just ComEd. Did the district court expect the plaintiff to plead facts in support of that claim? Because we still have a notice pleading. They did, but that statement, the plaintiff pleaded that direct energy was higher than other retail energy suppliers, but it was a completely conclusory allegation. And on appeal, the plaintiff has admitted, I don't have information about those ARIES rates. He hasn't pleaded anything about what our actual competitors were charging. The only factual allegations in the complaint are ComEd's rates and a PJM rate, which the plaintiff, it's not the PJM rate for the load zone. It's a weighted rate across 13 states and 21 different load zones. Those are the only factual allegations. And the district court correctly found that that didn't state a plausible claim because the contract didn't promise that the rate would be tied to either one of those things. The complaint alleges that prevailing market prices relates to the utility, to wholesalers, not just the PJM day ahead rate, but to all number of energy traders and to all our other competitive suppliers, of which the complaint alleges they're 97th in Illinois. So that's over 100 different comparators that direct energy can take into account when setting its rate. The complaint only has factual allegations about two of those. With regard to the pleading, appellant's going to argue we're whipsawed, we never got discovery. Your response, as I understand it, is you don't need discovery because the publicly available information, which would give comparators. Is that correct? They could and should have done that investigation ahead of time. They've suggested that this case presents a novel question about the plausibility standard. That's in their statement about oral arguments, that this is their novel legal questions regarding plausibility when facts are not known or not available. And my first point, as I said, is they are. But second, that's not a novel question. That's the question that Twombly answered. Twombly was a case in which the plaintiffs were telephone and Internet subscribers who alleged an antitrust conspiracy and said that the facts were exclusively in the defendant's possession. And the court said, well, you still have to plead facts to show a plausible claim, to nudge it across the line from conceivable to plausible. And that's exactly what we have here. An appellant may rely on Mercado, another district court in this building appealing, in which the determination was made that they did get over that line. How is Mercado distinguishable in your opinion? Mercado is distinguishable principally because the contract language is broader. First, the market conditions, which the court found to be ambiguous. But also, the contract didn't reserve any discretion to Mercado. Here, the contract explicitly reserved discretion to Direct Energy in evaluating prevailing market prices and in setting the adder. There's nothing in the contract that counsel suggested that ComEd was the more relevant comparator. And I would contend it's not at all. As Your Honor said, that's a regulated rate, and Direct Energy charges a deregulated rate. But the contract didn't require Direct Energy to weigh those prevailing prices in any particular way or to outweigh ComEd's rate against the others that were available. It left that discretion to Direct Energy, and that's something that the Mercado case didn't give to Verde Energy. The basic fact here is, and the reason that the district court's decision should be upheld is that there are not sufficient facts to state a plausible claim. Mr. Sivagan saw a number of other cases like this that were being filed, and he speculated that if he could get some discovery that he might be able to bring a claim against Direct Energy. Well, as I said, there is other information available. I'll give one good example, and it was not included because it's not a good comparator for Mr. Sivagan. The Zahn case, which this court heard and issued an opinion in 2017, cited by both parties. It was another variable rate case from the Northern District of Illinois. And in the Zahn complaint, which was filed in 2015, that included information about North American power's variable rates for electricity during a time period that overlapped with Direct Energy's. The complaint said that that rate, the North American power rate, went from $0.05 to nearly $0.16 in a time period spanning 2012 to 2014. Mr. Sivagan received variable rates from September 2013 into 2014 from Direct, and his variable rate was never more than $0.087 during that time period. So that's another publicly available piece of information about what competitors are charging. It's just a good one for Direct. Here, Mr. Sivagan has said there are three options. One, that Direct Energy didn't base its rate on prevailing market prices, although in a footnote on page 59 of his brief, he says it's more likely than not that we did. Two, we set an unreasonable adder. Or three, both. But importantly, there's a fourth option that's left open by the pleadings, and that's none of the above. The facts alleged in the complaint don't do anything more to suggest that Direct breached than they do to suggest that Direct did not breach, because the contract didn't require Direct Energy to set its rate. It correlated strictly to the PJM load zone rate or to the utilities rate. It left that discretion to Direct Energy, and there aren't any facts about Direct Energy's discretion and how it exercised it. Mr. Sivagan doesn't plead any facts about other areas' rates. He doesn't plead any facts about what the PJM rate was at the utility load zone. He pleads it about a weighted rate, and he doesn't plead any facts about the prices that we charged for, I'm sorry, the rates that we paid by power. Now, Your Honor asked an interesting question about a lobster comparison, which I think it is applicable. And what Mr. Sivagan did is no different than the consumer in a restaurant who says the lobster's market price, I'll take it, without asking what the price is going to be. He had the option to call in ahead of time. He had the option to find out by going to PluginIllinois.org what other rates were available to him. He had the option to leave any time he wanted without any penalty and could have gone to any other supplier, and he chose not to. Direct Energy has not done anything to hide information about its rates from him with respect to the information that Mr. Sivagan says isn't available to him to plead a claim. This is not a case where Direct Energy controls that information and won't release it to him. This is a case where he has just not met his pleading part. Are you asserting that Direct Energy's discretion applies to both the generally prevailing market prices and the adder, or is the discretion simply limited to the adder? To both, Your Honor. To both. Would you concede that such discretion in a contract is capped by good faith or reasonableness? I would, although I think the Rome case, which Judge Bower was part of that opinion, it's a 1992 case, says that the breadth of discretion that's given to a defendant gives an equally broad set of expectations to the customer, which reduces the judicial review to virtually zero. So Direct Energy's discretion in the contract is cabined by the covenant of good faith and fair dealing. But the covenant under Illinois law still allows that discretion to be exercised very broadly. And I would say that with that breadth of discretion, it's completely unreasonable to say that a consumer would expect prevailing market prices to be based on just one price, whether it's the regulated ComEd rate or this PJM rate that's cited. I'd like to also respond to this notion that Direct Energy agreed to set its price competitively with ComEd. I think that the contract language, the plain language of the contract, the payment terms clause, just undermines that entirely. That provision only explains that while ComEd's rate is set by the Illinois Commerce Commission, Direct Energy's rate and the rates of all other energy suppliers, it references other energy suppliers, is set competitively, meaning it's set by the market. It's not a promise that Direct Energy is going to beat ComEd. Well, he is saying that the contract is ambiguous, and you are saying that he waived that argument. I'm saying that he waived that argument, and I'm also saying that he has not presented a reasonable alternative argument to our interpretation of the contract. To find an ambiguity, there have to be two reasonable interpretations presented, and he's not presented one. But he did waive that argument by not making it in the district court. In the district court, he said the contract language was unambiguous. The appendix indicates there are 16 other cases. I'm at appendix 509 and a few pages afterward. One of those 16 cases is the Second Circuit case Richards, and the contrast on the table is with the various different contract language that the cases involve. Is there different contract language in the Richards case from the Second Circuit in this case because the states require different contractual language, or why, if it's the same defendant, Direct Energy, would it be different contract language between Richards in this case? Your Honor, it has to be approved by states. I don't know the full history of all those sets of terms and conditions that have been used, but I do know that the contract that was submitted in Richards, Connecticut requires that that contract be submitted to Pura, the regulator there, ahead of time, and it has to include certain disclosures by statute. I think that's what accounts for the variations. So it's a regulated, unregulated industry? Partially deregulated is what they commonly refer to it as. I think the Richards decision is very instructive. Your Honor is very familiar with it. I think it hits on some important policy implications in the suggestion that a regulated utility rate should be imposed on retail energy suppliers. I see that my time is coming to an end, so unless the Court has any other questions. Thank you. Thank you. Okay, Mr. Lee. Thank you, Your Honors. If I can go back to the question we were discussing about the regulated rates versus unregulated rates. I mean, there's no doubt that the common rate is one that's regulated by the ICC, but the Illinois Supreme Court stated in Zond, in response to a certified question from this Court, that the prices that Aries charges its customers is a matter of contract, and that's exactly what our claim is about, the contract language of direct energy that requires it to set its prices competitively. Now, it didn't have to put that language in there. It was not required by the ICC or the rate relief law. They chose to put that language in there, and by choosing to put that language in there, they're bound by it. They have to set their prices competitively. Now, the issue here is one of reasonable comparators and the confusion of Even though, see, here, I'm stymied by this. Even though the contract was not designed to compete with regulated prices, but with other unregulated independents? Well, Your Honor, they all compete for the same consumer, right? You can be a common consumer, or you can switch. Like I stated, Mr. Savuge was a common customer. Direct energy solicited him to switch plans, electricity suppliers, and he did so based on the contract that they provided, a contract that said that the rates would be set competitively. Now, even if that language isn't an independent promise that could be breached, it certainly informs the interpretation of the rest of the contract, and that's where we get into this whole issue of the reasonableness of the rates and the exercise of their discretion. All of that, by operation of the law, the missing price term law, as supplied by the UCC, or the implied covenant of good faith and fair dealing, which the district court didn't address at all, requires that that rate be reasonable, and that the rate be consistent with the expectations of the party. Here, we have to remember that the purpose of deregulation, the purpose of the rate relief law, was to allow Aries to compete with ComEd. ComEd was the only game in town, and it required that these Aries ensure that they provided price decreases for consumers. That's the whole point of deregulation. They thought competition would lead to lower prices. Now, they chose to say, we are going to compete with the market, and they didn't. Their prices are not competitive vis-a-vis ComEd. Now, again, ComEd, yes, is one of 98 providers in the industry, but what we're confusing here is a matter of frequency versus dominance, that there are other participants in the market. Each participant has a small sliver of the consumer marketplace, while ComEd has a majority at 70%. If we think about this from an antitrust perspective, for example, a company with 60%, 70% market share would be considered a near monopoly. That's what ComEd is, and that's why its prices are relevant for determining the plausibility of whether or not their rates are competitive. Now, there were a couple of misstatements and miscategorizations of our pleadings that must be corrected. Counsel admitted that these rates available on Plugin Illinois only go back to 2017, while our plaintiff was with Direct Energy 2013 to 2016. So he couldn't have used this website for that information. So we have that. We also have issues about the fact that he said, well, there's all these other sources. He could go to the ICC. But we've just established that the ICC doesn't regulate the rates of these areas. So no, there were not easily accessible sources of this information. A consumer who goes to the PGM market website can't make apples and oranges about the pricing methodology there. I mean, they use terms like locational marginal pricing and whatever that's supposed to mean. This was a putative class action, correct? Correct, Your Honor. So if other individuals were going to be joining in this complaint that Direct Energy is not competitive or that it's violative of its contract, other individuals could have been talked to as to what their experiences were with other areas, correct? Assuming that they were customers of other areas. And then that could have been incorporated into the complaint, correct? Correct. There's like 97 or 98 of the areas? Correct, Your Honor. Again, though, it is a putative class action. We have not had contact with class members because there is no certified class at the moment. And we don't know who these members are. We don't have a list that we can reach out to. And again, it assumes that these customers are switching from one area to another. Well, what we have in the record is the fact that Mr. Savookin switched from ComEd to Direct Energy. Lastly, I see I'm running out of time, is that Mercado case is distinguishable. Same defendant, but everything else is different. And in a contract case, the contract language must control. That's why the Second Circuit's opinion has no persuasive value in this case. I see I'm out of time. Unless there are any further questions, thank you, Your Honor. Thank you very much. Thanks to both parties. And the case will, as all cases, be taken under advisement.